FILED
CLERK

2/14/2013 3:01 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
SCOTT GOBOS

                Plaintiff,

        -against-

MICHAEL J. ASTRUE, as
COMMISSIONER OF SOCIAL SECURITY

                Defendant.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
11-CV-4477 (ADS)

<u>**APPEARANCES:**</u>

**Klee & Woolf**
*Attorneys for the Plaintiff*
350 Willis Avenue
Mineola, NY 11501
      By: Jonathan R. Klee, Esq., Of Counsel

**Loretta E. Lynch**
United States Attorney
Eastern District of New York
*Attorneys for the Defendant*
610 Federal Plaza, 5th Floor.
Central Islip, New York 11722
      By: Robert W. Schumacher, II, Assistant United States Attorney

**SPATT, District Judge**.

The Plaintiff Scott Gobos ("the Plaintiff") commenced this action pursuant to the Social

Security Act ("the Act"), 42 U.S.C. § 405(g), challenging a final determination by Michael J.

Astrue, the Commissioner of Social Security ("the Commissioner") that he was ineligible for

Social Security disability benefits. Presently before the Court is the Commissioner's motion for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c).

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is

granted.

# I.     BACKGROUND

## A. Procedural History

On June 5, 2009, Gobos filed an application for Social Security disability benefits, alleging a disability and inability to work since March 31, 2002, due to the alleged impairment of his left and right shoulders.  (Compl., ¶ 4; Administrative Transcript ("Tr.") at 77–78.)   On August 11, 2009, the Social Security Administration ("SSA") denied his application and the Plaintiff made a timely request on September 17, 2009 for a hearing before an Administrative Law Judge.  (Compl., ¶¶ 5–6.)

On August 13, 2010 and February 14, 2011, a hearing was held before Administrative Law Judge Zachary S. Weiss ("the ALJ").  (Tr. at 38, 57.)  At the hearing, only the Plaintiff and Dr. Donald I. Goldman, M.D. ("Dr. Goldman") testified.  (Tr. 38–76.)  Following the hearing and a review of the record by the ALJ, in a decision dated February 25, 2011, the ALJ denied the Plaintiff's claim for disability benefits.  (Tr. at 24–33.)  On March 23, 2011, the Plaintiff sought review of the ALJ's decision by the Appeals Council.  (Tr. At 22.)  On July 14, 2011, the Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's February 25, 2011 decision the final decision of the Commissioner in the Plaintiff's case.  (Tr. 1–3.)  On or about September 16, 2011, the Plaintiff commenced the present appeal from that decision.

## B.  The Administrative Record

### 1.  The Plaintiff's Medical Background Prior to the Onset Date of March 31, 2002

The Plaintiff was born on May 1, 1963 and was 46 years old at the time he filed his claim for disability benefits.  (Tr. at 77.)  He completed two years of college in 1983.  (Tr. at 163.)  On May 4, 2000, while working as a police officer for the New York City Police Department, the Plaintiff sustained the injury that forms the basis of his claim.  (Tr. at 160, 218.)  His

employment as a police officer required him to drive around and stop if an incident was occurring, to make arrests and to help people. (Tr. at 160.) His duties also required him to lift objects and people. In this regard, for one-third to two-thirds of the workday, he was required to lift 50 pounds of weight or more, and the heaviest weight he lifted was 100 pounds or more. (Tr. at 160.) The Plaintiff stopped working on March 31, 2002. (Tr. at 159.)

With regard to his shoulder injuries, on or about June 7, 2000, the Plaintiff was examined by orthopedist Hank Ross, M.D. ("Dr. Ross"). (Tr. at 218.) Prior to this examination, the Plaintiff had been going to physical therapy, but continued to suffer from chronic pain. (Tr. at 218.) Dr. Ross noted that the Plaintiff was "unemployable" and requested authorization to conduct an arthroscopic evaluation of the right and left shoulders with possible open rotator cuff repair. (Tr. at 218.)

On August 24, 2000, the Plaintiff's right shoulder underwent arthroscopy and operative procedures. (Tr. at 214.) On August 30, 2000, the Plaintiff visited Dr. Ross. (Tr. at 219.) Dr. Ross noted that the Plaintiff was "doing well," "comfortable" and "neurologically intact." (Tr. at 219.) Dr. Ross referred the Plaintiff to physical therapy. On September 20, 2000, Dr. Ross again observed the Plaintiff was "doing well" and that "[h]is range of motion [was] improving." (Tr. at 219.) However, the Plaintiff did "have some pain and swelling" and Dr. Ross prescribed Celebrex. (Tr. at 219.) On October 18, 2000, Dr. Ross examined the Plaintiff and noted that the Plaintiff was "doing very well with his right shoulder." (Tr. at 219.) The Plaintiff did not have any complaints other than some weakness. (Tr. at 219.)

Also on October 18, 2000, Dr. Ross requested authorization for acromioplasty of the Plaintiff's left shoulder. (Tr. at 219.) On November 30, 2000, the Plaintiff's left shoulder underwent athroscopic acromioplasty and operative procedures. (Tr. at 211.) On December 1,

2000, Dr. Ross referred the Plaintiff to physical therapy. (Tr. at 220.) On December 15, 2000,

Dr. Ross observed that the Plaintiff had "improving range of motion of the shoulder" and was

"continu[ing] on course with physical therapy." (Tr. at 220.) According to Dr. Ross, the

Plaintiff "remain[ed] unemployable." (Tr. at 220.) Dr. Ross prescribed Vioxx to the Plaintiff.

(Tr. at 220.) On January 5, 2001, the Plaintiff returned to Dr. Ross's office. Dr. Ross noted that

the Plaintiff "continue[d] to have weakness and some restriction of motion in the left shoulder."

(Tr. at 220.) Again, Dr. Ross noted that the Plaintiff was "unemployable." (Tr. at 220.) On

January 26, 2001, during the Plaintiff's visit, Dr. Ross observed that the Plaintiff "ha[d]

persistent pain, limitation of motion, and weakness." (Tr. at 220.) However, at his February 23,

2001 visit, the Plaintiff was "doing better following his left shoulder acromioplasty with physical

therapy, range of motion, stretching and strengthening." (Tr. at 220.) By this time, the Plaintiff

had returned to working light duty. (Tr. at 220.)

On March 29, 2001, Dr. Ross again saw the Plaintiff. Dr. Ross noted that the Plaintiff

had "persistent pain and limitations of motion in his both shoulders, left worse than right[.]" (Tr.

at 221.) Dr. Ross prescribed the Plaintiff Zanaflex. (Tr. at 221.) The Plaintiff was still working

on restrictive duty. (Tr. at 221.) On April 26, 2001, Dr. Ross observed that the Plaintiff was

"continu[ing] to improve, although he [did] have some pain and weakness." He was continuing

to work in a limited duty capacity and continuing on course with his physical therapy program.

(Tr. at 221.)

By the Plaintiff's May 24, 2001 appointment with Dr. Ross, he was no longer going to

physical therapy. (Tr. at 221.) Dr. Ross requested authorization for additional physical therapy.

(Tr. at 221.) The Plaintiff "ha[d] pain and limitation of motion in both shoulders," but

"remain[ed] employable light duty only." (Tr. at 221.) On July 5, 2001, Dr. Ross noted that the

Plaintiff was still on limited duty and was undergoing physical therapy. (Tr. at 221.) The Plaintiff continued to have pain and limitation of motion. (Tr. at 221.) On August 9, 2001, Dr. Ross again observed the Plaintiff's pain and limited motion in both shoulders, but stated that the Plaintiff, who was still working on limited duty, could continue on limited duty. (Tr. at 221.) However, Dr. Ross opined that the Plaintiff "would not be safe to return to full active duty as a police officer" and that "his condition [was] permanent in nature." (Tr. at 221.) On September 7, 2001, the Plaintiff complained to Dr. Ross of "chronic bilateral shoulder pain and limitation of motion." (Tr. at 227.) The Plaintiff advised Dr. Ross that he "receive[d] relief with physical therapy[.]" (Tr. at 227.) The Plaintiff "continued to have decreased ROM [range of motion] and weakness in abduction" in his shoulders. (Tr. at 227.)

On September 10, 2001, Dr. Ross provided the New York City Police Department with a complete medical narrative report regarding the Plaintiff and those injuries he sustained at work on May 4, 2000. (Tr. at 222–26.) Dr. Ross concluded that the Plaintiff

> has a permanent partial disability. It is in my opinion that this patient will be unable to return as a police officer, in the line of duty. The patient has been working in a limited duty capacity. The patient understands he may develop chronic pain due to tendinosis of the supraspinatus muscle. He will require continued physical therapy to gain motion and strength of his shoulders.

(Tr. at 226.)

Following Dr. Ross's letter to the New York City Police Department, the Plaintiff had two additional appointments. First, on October 8, 2001, Dr. Ross observed that the Plaintiff "continue[d] to have chronic pain and weakness in both the right and left shoulders, consistent with rotator cuff tendinitis, bicipital tendinitis." (Tr. at 227.) The Plaintiff was "continu[ing] on course with his therapy program and restricted duty." (Tr. at 227.) Second, on November 16, 2001, Dr. Ross stated that the Plaintiff was "not doing well and continu[ing] to have pain and

weakness in both the right and left shoulders associated with stiffness." (Tr. at 227.) According to Dr. Ross, the Plaintiff "ha[d] tendinosis of both tendons adding to his residual pain and stiffness which is permanent in nature." (Tr. at 227.) Dr. Ross did not believe that the Plaintiff "[could] return to active duty as a police officer and that these conditions [we]re permanent at [that] time." (Tr. at 227.)

### 2. The Plaintiff's Medical Background After the Onset Date of March 31, 2002

The Plaintiff's internal medicine physician since 1992, Dr. Andrew Weber, M.D. ("Dr. Weber"), provided the ALJ with letters concerning the Plaintiff's condition, as well as the Plaintiff's medical records. (Tr. at 233–39, 248–62.) From 2002 until 2010, the Plaintiff visited Dr. Weber semiannually. (Tr. at 233–39, 248–53.) During these visits, Dr. Weber noted that the Plaintiff had chronic pain in his shoulders. (Tr. at 234, 237–39. 248–53.) The Plaintiff also complained about asthma, foot pain and trouble sleeping due to his shoulder pain (Tr. at 233–39, 248–53.) With regard to his foot pain, the Plaintiff was diagnosed with gout and an arthritis condition. (Tr. at 233–39, 248–53.)

To treat the Plaintiff's shoulder pain, Dr. Weber prescribed multiple pain medications, including Oxycontin, Percocet, Vioxx, Celebrex, Xanaflex and Vicodin. (Tr. at 306.) Of these pain medications, Vicodin worked the most effectively with the least side effects of drowsiness and lightheadedness. (Tr. at 306.) Nevertheless, according to Dr. Weber, the Vicodin that the Plaintiff took for his shoulder pain still made him "very fatigued." (Tr. at 246.)

At the ALJ's request, on July 27, 2009, Dr. Weber filled out a form concerning the Plaintiff's condition. (Tr. at 240–44.) Dr. Weber diagnosed the Plaintiff with having a bilateral shoulder injury and indicated the Plaintiff's current symptoms were "pain with movement in both shoulders" and pain with "movement lifting arms over head." (Tr. at 240, 242.) This

condition was chronic.  (Tr. at 241.)  According to Dr. Weber, in May 2000, the Plaintiff was injured as a police officer and tore tendons in both shoulders.  (Tr. at 241.)  The Plaintiff's treatment included physical therapy and Vicodin and Tylenol for pain.  (Tr. at 241.)  Dr. Weber found that the Plaintiff was limited to being able to lift and carry up to ten pounds of weight up to one-third of a work day.  (Tr. at 241.)  However, the Plaintiff had no other limitations with respect to standing, walking, sitting, pushing, pulling or any other limitation, including postural, manipulative, visual, communicative or environmental limitations.  (Tr. at 243.)

In a letter to the ALJ, also dated July 27, 2009, Dr. Weber explained that it was his opinion that the Plaintiff was "disabled from his chronic shoulder pain."  (Tr. at 246.)  Dr. Ross explained that the Plaintiff's

> shoulder pain is high intensity and he is frequently unable to sleep due to the severity of the discomfort.  He takes Vicodin to help with the pain that has [the] side [e]ffect of making him lethargic. In my opinion, he would not be able to perform sedentary work such as a secretary due to his chronic pain and needing Vicodin that makes him very fatigued.

(Tr. at 246.)

On August 17, 2010, Dr. Weber wrote another letter concerning the Plaintiff's condition. (Tr. at 255.)  Dr. Weber stated that his opinion of the Plaintiff's disability status was based on what the Plaintiff told him his limitations consisted of and that his opinions "[we]re not based on any diagnostic tests."  (Tr. at 255.)  Dr. Weber "believe[d] [the Plaintiff] [was] truthfully describing his disability."  (Tr. at 255.)  According to Dr. Weber, the Plaintiff claimed "he [was] unable at [that] time to do any sedentary work secondary to his chronic shoulder pains requiring Vicodin at times that make him lethargic."  (Tr. at 255.)

On September 1, 2010, Dr. Weber wrote a third letter, clarifying his previous letters concerning the Plaintiff's condition.  (Tr. at 262.)   He stated that the Plaintiff's "physical

limitations are restricted to his upper body shoulder areas and does not inhibit his lower body activities including activities as standing, walking or sitting. He needs to take Vicodin to control his chronic pain which makes him lethargic and dizzy and prevents him from performing a sedentary job." (Tr. at 262.) Dr. Weber concluded that it was his opinion that the Plaintiff was "totally disabled." (Tr. at 262.)

Dr. Weber wrote a final letter, dated February 22, 2011. (Tr. at 306.) In the letter, he explained that the Plaintiff had been on a variety of pain medications, but that Vicodin was the most effective with the least side effects of drowsiness and lightheadedness. (Tr. at 306.)

### 3. Consultative Examination of the Plaintiff by Dr. Linell Skeene, M.D.

On January 3, 2011, Dr. Linell Skeene, M.D. ("Dr. Skeene"), performed an orthopedic examination of the Plaintiff. (Tr. 289–98.) The Plaintiff was referred to Dr. Skeene by the Division of Disability Determination for a consultative examination. (Tr. 289, 291.) Dr. Skeene noted that the Plaintiff's chief complaint was "left shoulder pain," which the Plaintiff "described as throbbing, constant" and "aggravated by reaching and lifting greater than 3 lb." (Tr. at 289.) The Plaintiff was taking Vicodin for his shoulder pain, which gave him some relief. (Tr. at 289). The Plaintiff also had asthma and gout, which he treated by taking Proventil and Colchicine, respectively. (Tr. at 289–90.)

Dr. Skeene stated that the Plaintiff was "able to shower and dress independently" and "cooks cleans, does laundry, and shopping." (Tr. at 290.) In his spare time, the Plaintiff watched television. (Tr. at 290.) Dr. Skeene described the Plaintiff as "appear[ing] to be in no acute distress." (Tr. at 290.) Dr. Skeene reported that the Plaintiff "ha[d] a normal station, but walks with a limp due to gout of the right ankle." (Tr. at 290.) The Plaintiff was "unable to walk on his heels or toes" or to "squat fully." (Tr. at 290.) However, the Plaintiff "needed no help

changing for the exam or getting on and off [the] exam table." (Tr. at 290.) He was also "[a]ble to rise from [the] chair without difficulty." (Tr. at 290.)

With regard to the Plaintiff's upper extremities, Dr. Skeene observed that the Plaintiff had a limited range of motion of both shoulders. (Tr. at 290.) The Plaintiff did have full range of motion of elbows, forearms, wrists and fingers. (Tr. at 290.) He had no joint inflammation, effusion, or instability nor any muscle atrophy. (Tr. at 290.) Dr. Skeene opined that the Plaintiff "ha[d] moderate limitations for reaching and heavy lifting due to limited ROM [range of motion] of both shoulders." (Tr. at 291.)

Dr. Skeene also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" ("Medical Source Statement"). (Tr. at 293.) Dr. Skeene reported that the Plaintiff could only occasionally lift and carry up to ten pounds of weight. (Tr. at 293.) Dr. Skeene noted that the Plaintiff could sit for up to two hours at a time, stand for up to one hour at a time and walk for up to one hour at a time without interruption. (Tr. at 294.) In an eight-hour work day, Dr. Skeene believed the Plaintiff could sit for four hours, stand for two hours and walk for two hours. (Tr. at 294.) In addition, Dr. Skeene stated that the Plaintiff could ambulate for 50 feet without cane and that a cane was medically necessary. (Tr. at 294.) While using a cane, the Plaintiff could carry small objects in his free hand. (Tr. at 294.)

With regard to the Plaintiff's right hand, Dr. Skeene indicated that the Plaintiff could never reach overhead, but he could occasionally, or up to one-third of the time, do all other kinds of reaching, handling, fingering, feeling, pushing and pulling. (Tr. at 295.) With regard to his left hand, Dr. Skeene indicated that the Plaintiff could neither reach overhead nor do any other kind of reaching, but that he could occasionally, or up to one-third of the time, use his left hand for handling, fingering, feeling, pushing and pulling. (Tr. at 295.) Dr. Skeene found that the

Plaintiff had "operation of foot controls" in his right and left feet occasionally, or up to one-third of the time. (Tr. at 295.)

As for postural activities, Dr. Skeene stated that the Plaintiff could never climb ladders or scaffolds, but that he could occasionally, or up to one-third of the time, climb stairs and ramps; balance; stoop; kneel; crouch; and crawl. (Tr. at 296.) The Plaintiff had no hearing or vision impairments. (Tr. at 296.) Dr. Skeene believed that the Plaintiff could never tolerate exposure to the following conditions: unprotected heights; dust, odors, fumes and pulmonary irritants; extreme cold; and extreme heat. (Tr. at 296.) The Plaintiff could occasionally, or up to one-third of the time, tolerate exposure to moving mechanical parts; operating a motor vehicle; humidity and wetness; and vibrations. (Tr. at 297.) The Plaintiff could work in a moderate noise condition, such as in an office. (Tr. at 297.) In addition, Dr. Skeene indicated that the Plaintiff could perform the following activities: (1) shopping; (2) traveling without a companion for assistance; (3) ambulating without using a wheelchair, walker, two canes or two crutches; (4) walking a block at a reasonable pace on rough or uneven surfaces; (5) using standard public transportation; (6) climbing a few steps at a reasonable pace with the use of a single hand rail; (7) preparing a simple meal and feeding himself; (8) caring for his personal hygiene; and (9) sorting, handling or using paper or files. (Tr. at 298.)

It was Dr. Skeene's opinion that the limitations described in the Medical Source Statement lasted or would last for twelve consecutive months. (Tr. at 298.)

### 4. Consultative Examination of the Plaintiff by Dr. Donald I. Goldman, M.D. and Testimony at the Hearing

On November 15, 2010, at the request of the ALJ, Dr. Goldman, like Dr. Skeene, completed a Medical Source Statement with additional interrogatories concerning the Plaintiff's condition. (Tr. at 263, 275–88.) However, Dr. Goldman never examined the Plaintiff. (Tr. at 41.) Rather, Dr. Goldman only reviewed the 15 medical exhibits in the case. (Tr. at 41.) Thus, Dr. Goldman's opinion was rendered based on a review of the record, not an examination of the Plaintiff. (Tr. at 41.)

Dr. Goldman reported that the Plaintiff could lift and carry up to ten pounds of weight continuously, or over two-thirds of the time, lift and carry eleven to 20 pounds of weight frequently, or one-third to two-thirds of the time, and never lift or carry any weight 21 pounds or more. (Tr. at 278.) Dr. Goldman believed that the Plaintiff could sit without interruption for eight hours and that the Plaintiff did not have any limit on how long he could stand or walk. (Tr. at 279.) In an eight hour work day, the Plaintiff could sit, stand or walk for a total of eight hours. (Tr. at 279.) Dr. Goldman also indicated that the Plaintiff did not require a cane to ambulate. (Tr. at 279.)

With regard to the Plaintiff's ability to use his hands, Dr. Goldman indicated that the Plaintiff could never use his hands to reach overhead, but that he could frequently, or one-third to two-thirds of the time, do all other kinds of reaching. (Tr. at 280.) The Plaintiff could continuously, or more than two-thirds of the time, use his hands for handling; fingering; feeling; pushing and pulling. (Tr. at 280.) Further, the Plaintiff could continuously, or over two-thirds of the time, climb stairs and ramps; balance; stoop; kneel; crouch and crawl. (Tr. at 281.) Dr. Goldman did not believe that the Plaintiff could tolerate exposure to unprotected heights. (Tr. at 282.) Dr. Goldman found that the Plaintiff could occasionally, or up to one-third of the time,

tolerate exposure to moving mechanical parts. (Tr. at 282.) Like Dr. Skeene, Dr. Goldman noted that the Plaintiff could shop; travel without a companion for assistance; ambulate without using a wheelchair, walker, two canes or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle or use paper or files. (Tr. at 283.)

Dr. Goldman stated that the Plaintiff's limitations that were described in the Medical Source Statement had been present since 2002. (Tr. at 283.) Dr. Goldman further stated that the Plaintiff had no range of motion in his shoulder, but that he did not suffer any atropy, loss of grip or injury to his fingers, hands wrists or elbows. (Tr. at 285.) Dr. Goldman opined that the Plaintiff "[could] work with restrictions." (Tr. at 284–85.) He also believed the Plaintiff could lift and carry 20 to 25 pounds of weight occasionally and ten to 15 pounds of weight frequently. (Tr. at 286.)

Dr. Goldman also testified at the hearing before the ALJ on February 14, 2011. (Tr. at 38–56.) At the hearing, Dr. Goldman gave the following testimony concerning the Plaintiff's condition:

> The facts were that he did have surgery in both shoulders.
> I'm sure he does have some residual pain. He was able to work for
> several years after this. There is some information that shows he
> has restrictions of motion in both shoulders pushing and upwards .
> . . ; however, my opinion was that he could work with restrictions.

(Tr. at 42.)

Dr. Goldman agreed that Vicodin could cause dizziness and lethargy, although they were not common, and that such symptoms could affect the Plaitniff's ability to perform even a sedentary job. (Tr. at 45–46, 55.) Although Dr. Goldman recognized that the Plaintiff had been

prescribed other medications in the past, he still questioned why Dr. Weber maintained the Plaintiff on Vicodin when it caused him to be drowsy or dizzy. (Tr. 44, 46.)

### 5. The Plaintiff's Testimony at the Hearing

On August 13, 2010 and February 14, 2011, the Plaintiff testified at the hearing before the ALJ concerning his claim. (Tr. at 38–76.) According to the Plaintiff, he received his injuries in the performance of his duties as a police officer. Specifically, while pursuing a suspect, the Plaintiff ran around the corner of a building and tripped on the uneven sidewalk. (Tr. at 66–67.) He fell down on the concrete face first and felt his shoulder pop. (Tr. at 67.)

When asked by the ALJ why he could not work, the Plaintiff answered that "the biggest reason is because the lack of sleep I get each and every night—at best, I get two and a half, maybe three hours of sleep, and it's choppy at best." (Tr. at 64.) The Plaintiff further explained that "the pain I'm in during the day coupled with the lack of sleep and the Vicodin that I have to take to relieve the pain just—I'm so dizzy I can barely see straight." (Tr. at 64.) The Plaintiff took Vicodin four times a day, plus took Tylenol as a supplement. (Tr. at 72, 74.) These medications allegedly caused him dizziness. (Tr. at 74.)

Although he had originally assumed he would be able to work again, the Plaintiff felt that he would no longer be unable to do so due to "the pain and the medication and the lack of sleep." (Tr. at 71–72.) In this regard, the Plaintiff claimed that "[he] wanted to work after [he] retired and . . . tried to . . . get [him]self together, and . . . hoped it would get better, but. . . [he] regressed since [he] retired." (Tr. at 72.)

With regard to his lack of sleep, the Plaintiff claimed he woke up frequently because of pain. (Tr. at 65.) In this regard, the Plaintiff explained:

> I get a numbing down my arm and then I get a searing pain in my
> shoulder and then I got to switch and then, you know, maybe I'll

> get another half an hour and the it'll happen again. And then I'm
> up for four hours and then maybe I'll pass out an hour.

(Tr. at 65.) The Plaintiff said that he had tried to take sleeping pills, but he no longer took them because "[t]hey just don't work." (Tr. at 64–65.) The Plaintiff had never been to a sleep specialist. (Tr. at 65.)

On a scale of one to ten, the Plaintiff described his pain as a nine or ten without medication, and as a six with medication. (Tr. at 67.) The Plaintiff had spoken to his doctor about finding ways to treat his pain, but felt that "it just seems to be getting worse." (Tr. at 67–68.) The Plaintiff completed his physical therapy in December 2001. (Tr. at 68.) He visited an orthopedic doctor, Dr. Ross, in early 2002. (Tr. at 68.) However, since 2002, the Plaintiff had not been to see any other doctors other than Dr. Weber. (Tr. at 68.) According to the Plaintiff, he did not seek other medical opinions aside from Dr. Weber's because he "just didn't think it was going to help," since he had "been through the two surgeries and physical therapy and [he] just got worse[.]" (Tr. at 72.) The Plaintiff did not recall Dr. Weber ever recommending he visit a pain management specialist. (Tr. at 72.) The Plaintiff stated that he had previously tried epidural or Cortisone injections during therapy, but that it "didn't work very well either[.]" (Tr. at 72.)

While the Plaintiff was working as a police officer on light duty after his 2000 shoulder operations but prior to retiring in 2002, the Plaintiff drove himself to work and tried not to take medication during the day. (Tr. at 51–52.) The Plaintiff limited himself to one pill a day while working. (Tr. at 51.) The Plaintiff also carried a gun on him at the police station house. (Tr. at 52.)

The Plaintiff described his everyday activities of consisting of waking up, having a bowl of cereal and doing grocery shopping two to three times a week. (Tr. at 65–66) However, the

Plaintiff stated he did not do too much grocery shopping because he "[did not] want to be lugging around . . . 80 pounds of bags." (Tr. at 65.) Thus, he went grocery shopping two to three times a week so he did not have to carry too much at one time. (Tr. at 66.) When the Plaintiff returned home from grocery shopping, he would make himself a microwavable meal (Tr. at 66.) The Plaintiff tried to take "two naps during the day just to get through it." (Tr. at 66.)

In addition, the Plaintiff testified that, although it was painful, he could dress himself with a little difficulty. (Tr. at 67.) The Plaintiff had problems taking a shower, finding it "hard," "awkward" and "painful," since he had trouble reaching above his head. (Tr. at 67.) According to the Plaintiff, after he lifts five or ten pounds of weight, he "feels very sore and . . . get[s] very tired and . . . really feel[s] it the next day" in that he experiences "twice as much pain as the day before." (Tr. at 73–74.) As a consequence, the Plaintiff avoided "lifting two days in a row, even the smallest things." (Tr. at 74.) The Plaintiff found it hard to read books, did not garden and did not cook, instead using a microwave. (Tr. at 74–75.) The Plaintiff could only use his cell phone for about a minute or two a time, and could not stay on the phone long. (Tr. at 75.)

The Plaintiff watched some television and used the computer for 20 minutes a day to go on the internet and communicate with friends via the website Facebook. (Tr. at 68–70.) The Plaitniff was able to drive. (Tr. at 51.) Occasionally, the Plaintiff would go out with friends for lunch. (Tr. at 66.) In 2003, the Plaintiff traveled to New Orleans. (Tr. at 67.)

## C.  The ALJ's Findings

On February 25, 2011, the ALJ issued his decision. (Tr. at 27–33.) The ALJ addressed whether the Plaintiff was disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. at 27.) He also noted that the Plaintiff was required under sections 216(i) and 223 of the

Social Security Act to establish that he was disabled on or before December 31, 2007, which was the date he was last insured for disability insurance benefits, in order to be entitled to a period of disability and disability insurance benefits.  (Tr. at 27.)   "After careful consideration of all the evidence, the [ALJ] conclude[d] the [Plaintiff] was not under a disability within the meaning of the Social Security Act from March 31, 2000, through the date last insured."  (Tr. at 28.)

In particular, the ALJ found that:

1. The [Plaintiff] last met the insured status requirements of the Social Security Act on December 31, 2007.
2. The [Plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of March 31, 2002 through his date last insured of December 31, 2007 . . .
3. Through the date last insured, the [Plaintiff] had the following severe impairments:  status post right and left shoulder surgery . . . .  The [Plaintiff's] impairment causes significant limitations on his ability to perform basic work activity.
4. Through the date last insured, the [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404 . . . . The record does not establish that the severity of the [Plaintiff's] impairments rises to listing levels.  The findings of the undersigned are supported by the testimony of Dr. Goldman, an impartial medical expert.
5. After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the [Plaintiff] had the residual functional capacity to perform the full range of sedentary work.  Sedentary work is defined as involving lifting no more than ten pounds at a time, occasionally lifting or carrying small articles (such as docket files, ledgers, and small tools), sitting up to a total of six hours in an eight hour workday, and standing or walking up to a total of two hours in an eight hour work day. . . .

(Tr. at 29–30.)

The ALJ explained that "[i]n making this finding, . . . [he] considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical and other evidence," as well as opinion evidence.  (Tr. at 30.)  The ALJ pointed out that

although the Plaintiff testified at the hearing he could not work because of bilateral shoulder pain for which he underwent surgeries in 2000, he also admitted that he returned to work as a police officer on light duty until he retired in 2002.  (Tr. at 30.)  In this regard, the Plaintiff "did not take any pain medication before driving to work and limited himself to one pill a day, so he could function while on duty."  (Tr. at 30.)  He also carried a gun within the precinct.  (Tr. at 30.) The ALJ also noted that after completing his physical therapy in December 2001, the Plaintiff had not had any epidural or Cortisone injections and he never sought treatment for a pain management specialist.  (Tr. at 30.)

In light of this evidence, the ALJ concluded that the Plaintiff's "medically determinalble impairment could reasonably be expected to cause the alleged symptoms;  however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual function capacity assessment."  (Tr. at 30.)   The ALJ emphasized that the Plaintiff did not continue treatment with an orthopedist specialist after 2001 and instead sought treatment only from his internist, Dr. Weber, whose treatment was "rather sporadic" as he did not even see the Plaintiff in 2004.  (Tr. at 31.)  He further noted that Dr. Weber did not base his opinion on the Plaintiff's disability status on diagnostic testing, but instead on the Plaintiff's self-reported, subjective complaints, which the ALJ found unsupported by the record.  (Tr. at 31.)   He thus "[gave] little weight to the opinion of Dr. Weber, as it [was] neither supported by nor consistent with the substantial evidence of the record."  (Tr. at 31.)

The ALJ also found that the Plaintiff's "admitted activities of daily living patently contradict[ed] his allegations of disability."  (Tr. at 31.)  Such activities included showering, dressing himself, cooking, cleaning, doing laundry and shopping independently on a substantial

basis. (Tr. at 31.) The Plaintiff also "did not take any pain medication so that he could drive to work and limited himself to only one dosage of pain medication during his workday prior to retirement." (Tr. at 31.) In addition, the ALJ pointed out that the Plaintiff's "clinical records do not document any complaints regarding the medication side effects alleged by the [Plaintiff]." (Tr. at 31.)

The ALJ "[gave] significant weight to the opinion of Dr. Goldman, as it [was] consistent with the substantial evidence of record." (Tr. at 32.) Conversely, he gave "[l]ittle weight to the opinion of [Dr. Skeene] . . . because it [was] not consistent with the [Plaintiff's] own admissions and the substantial evidence of the record." (Tr. at 32.)

The ALJ made the following additional findings:

> 6. Through the date last insured, the [Plaintiff] was unable to perform any past relevant work . . . . The [Plaintiff] had past relevant work as a police officer, which is generally described as skill, light exertional work . . . . As the [Plaintiff] has the residual functional capacity for only sedentary work, he cannot perform his past relevant work as a police officer.
>
> 7. The [Plaintiff] was born on May 1, 1963 and was 44 years old, which is defined as a younger individual age 18–44, on the date last insured . . . .
>
> 8. The [Plaintiff] has at least a high school education and is able to communicate in English . . . .
>
> 9. Transferability of job skills is not material to the determination of disability becasuse applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the [Plaintiff] has transferable job skills . . .
>
> 10. Through the date last insured, considering the [Plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [Plaintiff] could have performed . . . . Based on a residual functional capacity for the full range of sedentary work, the [ALJ] conclude[d] that, through the date last insured, considering the [Plaintiff's] age, education, and work experience, a finding of "not disabled" is directed by Medical Vocational Rule 201.28.

> 11.  The [Plaintiff] was not under a disability, as defined in the Social Security Act, at any time from March 31, 2002, the alleged onset date, through December 31, 2007, the date last insured[.]

(Tr. at 32–33.)  Accordingly the ALJ found that "[b]ased on the application for a period of disability and disability insurance benefits filed on June 5, 2009, the [Plaintiff] was not disabled under section 216(i) and 223(d) of the Social Security Act through December 31, 2007, the last date insured."  (Tr. at 33.)

## II.    DISCUSSION

### A.  Standards of Review

An unsuccessful claimant for Social Security benefits may bring an action in federal district court to obtain judicial review of the denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record.  See 42 U.S.C. § 405(g); Janinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Brown v. Apfel, 174 F.3d 59, 61–62 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), and requires such relevant evidence that a reasonable person "might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).

In addition, the Commissioner must accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques; results from frequent examinations; and is consistent "with the other substantial evidence in [the] case record."  See Clark v. Commissioner of Soc. Sec., 143 F.3d

115, 118 (2d Cir. 1998). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice of determination or decision for the weight he gives the claimant's treating source's opinion." Id.

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Further, the Court must keep in mind that "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark, 143 F.3d at 118. Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Secretary of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). A reviewing court may "enter upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decisions of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B. Analytical Framework for Determining Disability

To qualify for disability benefits under 42 U.S.C. § 423(d)(1)(A), a plaintiff must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004). The Act also provides that the impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id.

Federal regulations set forth a five step analysis that the ALJ must follow when evaluating disability claims, including: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" medically determinable physical impairment which will impair the claimant from doing basic work activities; (3) whether the claimant's severe medical impairment, based solely on medical evidence, is a limitation that is listed in Appendix 1 of the regulations; (4) an assessment of the claimant's residual functional capacity and ability to continue past relevant work despite severe impairment; and (5) an assessment of the claimant's residual functional capacity along with age, education, and work experience. As to the last stage of the inquiry, the burden shifts to the ALJ to show that the claimant can perform alternative work. See 20 C.F.R. §§ 404.1520, 416.920.

When proceeding through this five step analysis, the ALJ must consider the objective medical facts; the diagnoses or medical opinions based on these facts; the subjective evidence of pain and disability; and the claimant's educational background, age, and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

## C.  The ALJ Adhered to the Sequential Evaluation

As an initial matter, the Court finds that the ALJ adhered to the regulatory five-step sequential evaluation. First, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 31, 2002 through December 31, 2007, the date he last met the insured status requirements of the Act. Second, the ALJ found that the medical evidence established that on or prior to December 31, 2007, the Plaintiff had a severe medically determinable physical impairment, which he listed as "status post right and left shoulder surgery." (Tr. at 29.)

21

Third, the ALJ found that the Plaintiff's impairment or combination of impairments did not meet or equal in severity the clinical criteria of any impairment listed in Appendix 1 of the regulations. Fourth, the ALJ evaluated the Plaintiff's residual functional capacity and found that on or prior to December 31, 2007, he remained capable of performing sedentary work that involved sitting up to six hours in an eight-hour workday; standing or walking up to two hours in an eight-hour workday; and lifting or carrying small articles occasionally, but no more ten pounds of weight at a time. Consequently, the ALJ concluded that considering age, education, work experience, and residual functional capacity, the Plaintiff had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy and thus was not under a disability as defined under the Act. Accordingly, the ALJ applied the correct legal standard.

**D.  The ALJ's Findings are Supported by Substantial Evidence**

The Court also finds that the ALJ's decision was supported by substantial evidence. In this regard, the Court finds there was "relevant evidence [that] a reasonable mind might accept as adequate to support [the] conclusion[]" of the ALJ. Zabala v. Astrue, 595 F.3d 402, 408 (2d Cir. 2010) (internal quotation marks and citation omitted).

The Plaintiff first argues that the ALJ failed to rely on substantial evidence when assessing the Plaintiff's residual functional capacity ("RFC"). RFC is understood as the most that a person can do despite his or her limitations. 20 C.F.R. § 416.945(a)( 1). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8

hours a day, for 5 days a week, or an equivalent work schedule." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).

When the ALJ makes an assessment as to RFC, he should consider a claimant's physical abilities, mental abilities, symptomatology, including pain, and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). An RFC finding will be upheld on review when there is substantial evidence in the record to support the requirements listed in the regulations." Desmond v. Astrue, 11-CV-0818, (VEB), 2012 U.S. Dist. LEXIS 179805, at *14 (N.D.N.Y Dec. 20, 2012).

As noted above, the ALJ concluded that the Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567:

> (a)  Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567. The ALJ found that the Plaintiff could perform sedentary work, in that he was able to sit for six hours in an eight-hour day; stand or walk for two hours in an eight-hour day; and lift and carry small articles occasionally, but no more than ten pounds of weight at a time.

The ALJ partly based his decision upon the opinion of the consultative examiner, Dr. Goldman, who based his opinion on a review of the medical record. Dr. Goldman found that the Plaintiff had no limitations on standing or walking and could sit for eight hours without interruption. He also found that the Plaintiff could walk without a cane; occasionally carry up to 20 to 25 pounds of weight; frequently carry up to ten pounds of weight; and perform postural

activities such as climb stairs and ramps, balance, stoop, kneel, crouch and crawl. The Plaintiff could also shop; travel without a companion for assistance; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle or use paper or files. He did find that Gillespie had "reducible limitation of joints during extended wrists condition trying to extend all fingers." (Tr. at 166.) Many of these activities the Plaintiff admitted to being able to do. In addition, Dr. Goldman found that the Plaintiff had no observed atrophy, no loss of grip and no injury to fingers, hands, wrists or elbows. Further, although the Plaintiff could not reach overhead, he could otherwise reach frequently, as well as finger, handle, feel, push and pull continuously. Therefore, Dr. Goldman believed that despite the Plaintiff's shoulder injuries, he could work with restrictions.

The Court finds the ALJ properly relied upon Dr. Goldman's assessment in determining the Plaintiff's RFC. See Cichocki v. Astrue, 11-CV-755S, 2012 U.S. Dist. LEXIS 106023, at *19 (W.D.N.Y. June 30, 2012) ("It is well settled that an ALJ is entitled to rely upon the opinions of consultative examiners, and such written reports can constitute substantial evidence."); Ghio v. Astrue, Civil Action No. 2:10-CV-62, 2011 U.S. Dist. LEXIS 22138, at *55–56 (D. Vt. March 1, 2011) ("The ALJ was entitled to rely on the consultative examiners' assessment, in light of the objective medical evidence and his credibility finding."). In this regard, Dr. Goldman's assessment comported with the evidence in the record, which indicated that (1) in accordance with the opinion of his then-treating physician, Dr. Ross, the Plaintiff returned to work after his shoulders were injured in 2000 and was able to perform sedentary work and (2) even after his retirement in 2002, the Plaintiff was still able to engage in a range of

activities independently, including dressing, showering, shopping, driving and microwaving meals for himself, all of which suggested he would be able to perform sedentary work.

Second, the Plaintiff argues that the ALJ ignored medical evidence and did not afford the appropriate weight and consideration to the Plaintiff's treating physicians. As discussed above, "the ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the Treating Physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician." Moore v. Astrue, 07-cv-5207(NGG), 2009 U.S. Dist. LEXIS 81449, at *33 n. 22 (E.D.N.Y. Aug. 21, 2009). Indeed, "[t]he Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" Harris v. Astrue, 07-CV-4554 (NGG), 2009 U.S. Dist. LEXIS 67009, at *40 (E.D.N.Y. July 31, 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990)).

Nevertheless, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v)

other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." Id.  In addition, "the regulations also specify that the Commissioner will always give good reasons in [his] notice of determination or decision for the weight [he] gives claimant's treating source's opinion." Id. (citations and internal quotation marks and alterations omitted).

In his decision, the ALJ explained that "Dr. Weber acknowledged that he ha[d] not based his opinion on the [Plaintiff's] disability status on any diagnostic testing but rather the [Plaintiff's] self-reported subjective complaints." (Tr. at 31.)  As such, the ALJ stated he was "giv[ing] little weight to the opinion of Dr. Weber, as it [was] neither supported by nor consistent with the substantial evidence of record." (Tr. at 31.)  He also noted that "Dr. Weber's opinion that the [Plaintiff] [was] "totally disabled" [was] beyond the purview of his medical expertise and is an issue reserved to the Commissioner" under 20 C.F.R. § 404.1527(e).  (Tr. at 31.)

Despite the Plaintiff's arguments, the Court finds that the ALJ did not err in giving little weight to Dr. Weber's opinions.  "As an initial matter, [Dr. Weber's] assessments of [the Plaintiff's] 'disability status' are not determinative because it is the responsibility of the Commissioner to make the ultimate decision as to whether the claimant has a 'disability' under the statute." Micheli v. Astrue, No. 11-4756-cv, 2012 U.S. App. LEXIS 22172 (2d Cir. Oct. 25, 2012); see also Roma v. Astrue, 468 Fed. App'x 16, 18 (2d Cir. 2012) (". . . Dr. Prywes's assertion that Roma 'is permanently disabled,' cannot itself be determinative because it is the responsibility of the Commissioner to make the ultimate decision as to whether the claimant meets the statutory definition of 'disabled.'") (citations omitted).  Furthermore, the Plaintiff ignores that the opinion of Dr. Weber conflicts with the findings of Dr. Ross, an orthopedist who was the Plaintiff's other treating physician.  Specifically, Dr. Ross, who performed surgery on

both of the Plaintiff's shoulders, opined that the Plaintiff could work light duty as a police officer. In this way, Dr. Ross's findings appear to be consistent with those of Dr. Goldman. Therefore, although the ALJ does not specifically mention Dr. Ross's findings in his decision, the ALJ may have also rejected Dr. Weber's opinion on this basis. See, e.g., Netter v. Astrue, 272 Fed. App'x 54, 56 (2d Cir. 2008) ("Where, as here, a treating specialist and state-employed physicians are in agreement that an individual is not disabled, and where this conclusion is supported by record evidence, the Commissioner may reject the contrary opinion of one treating physician.").

In addition, unlike Dr. Goldman, Dr. Weber was not an orthopedic specialist, but an internist. Of importance, the Plaintiff did not seek and had not been treated by an orthopedist since he was treated by Dr. Ross in 2001. Further, as the ALJ pointed out, the Plaintiff's "treatment with Dr. Weber was rather sporadic." (Tr. at 31.) In this regard, "the clinical record indicates that he did not see Dr. Weber at all in 2004." (Tr. at 31.) Moreover, Dr. Weber found that the Plaintiff was able to occasionally lift and carry up to ten pounds of weight and had no other limitations with respect to standing, walking, sitting, pushing, pulling or any other limitation, including postural, manipulative, visual, communicative or environmental limitations. Yet, instead of relying on these findings which were inconsistent with his opinion that the Plaintiff was totally disabled, Dr. Weber relied solely on the Plaintiff's own subjective complaints of chronic pain and fatigue from Vicodin in forming his opinion.

The Court also notes that even though Dr. Goldman never examined the Plaintiff, "even 'nonexamining sources' may 'override treating sources' opinions, provided they are supported by evidence in the record." Netter, 272 Fed. App'x at 55–56 (citing Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993) (in turn, citing 20 C.F.R. §§ 404.1527(f), 416.927(f))); see also Diaz v.

Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he [August 1991] regulations (1) accord less deference to treating physicians whose opinions are not supported by other evidence; (2) consider the length of the relationship between the treating source and the claimant to be relevant; and (3) permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."); Cabassa v. Astrue, 11-CV-1449 (KAM), 2012 U.S. Dist. LEXIS 82046, at *20 (E.D.N.Y. 2012) ("Moreover, under the regulations, opinions of non-treating and non-examining doctors can override those of treating doctors so long as they are supported by evidence in the record."); Fessler v. Astrue, 09 Civ. 6905 (WHP) (JCF), 2011 U.S. Dist. LEXIS 11303, at *28 (S.D.N.Y. Jan. 10, 2011) ("Under 20 C.F.R. § 404.1527, not only may the reports of consultative or non-examining physicians constitute substantial evidence as to disability, but they may override the opinions of treating physicians in appropriate circumstances.").

The Plaintiff further asserts that the ALJ failed to acknowledge that Dr. Weber's opinion was corroborated by the findings of the other consultative examiner, Dr. Skeene. However, the ALJ decided to give little weight to Dr. Skeene's opinion "that the [Plaintiff] can only lift or carry up to 10 pounds, sit up to 4 hours in an 8 hour day, stand or walk up to 2 hours in an 8 hour day, never climb ladder or scaffolds, and only occasionally balance, stoop, kneel, crouch, or crawl," because it conflicted "with the [Plaintiff's] own admissions and the substantial evidence of record." (Tr. 32.) When the medical evidence appears to conflict, "[t]he trier of fact has the duty to resolve that conflict." Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). Also of importance, Dr. Skeene never even considered the Plaintiff's complaints of fatigue from Vicodin, which

formed a large basis for Dr. Weber's opinion. Hence, it does not appear to the Court that Dr.

Skeene's opinion fully corroborated the opinion of Dr. Weber, as the Plaintiff suggests.

Ultimately, as indicated above, the determination of whether a claimant is disabled is

"reserved to the Commissioner." 20 C.F.R. § 404.1527(e). Here, the Court finds that the ALJ's

determination of RFC— specifically, that the Plaintiff could perform sedentary work—was

supported by substantial evidence.

## E. The ALJ Properly Evaluated the Plaintiff's Impairments

The Plaintiff asserts that the ALJ erred in not crediting several of the Plaintiff's other,

severe conditions. According to the Plaintiff, the ALJ's decision indicates that the ALJ failed to

apply the *de minimis* standard when evaluating the Plaintiff's impairments. However, the Court

finds the Plaintiff's argument is misplaced.

As abovementioned, "[a]t step two of the sequential evaluation process, the ALJ must

determine whether the claimant has a severe impairment that significantly limits his or her

physical or mental ability to do basic work activities." Desmond, U.S. Dist. LEXIS at *9 (citing

20 C.F.R. §§ 404.1520(c), 416.920(c)). "[T]he severity prong is intended as a *de minimis*

standard to screen out only those claimants with 'slight' limitations that 'do not significantly

limit any basic work activity.'" Vicari v. Astrue, 1:05-cv-4967-ENV-VVP, 2009 U.S. Dist.

LEXIS 9670, at *8 (E.D.N.Y. Feb. 10, 2009) (quoting Bowen v. Yuckert, 482 U.S. 137, 158, 107

S. Ct. 2287, 96 L. Ed. 2d 119 (1987) (O'Connor, J., concurring, joined by Stevens, J.)); see also

Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) ("the severity regulation is valid only if

applied to screen out *de minimis* claims."). "If [] the disability claim rises above the *de minimis*

level, then the analysis must proceed to step three." Mattei v. Barnhart, CV-01-1678 (SJF) ,

2003 U.S. Dist. LEXIS 24649, at *19 (E.D.N.Y. 2003).

Here, the ALJ found that the Plaintiff had a severe impairment.  Specifically, the ALJ's decision stated "[t]hrough the date last insured, the [Plaintiff] had the following severe impairment: status post right and left shoulder surgery[.]"  (Tr. at 29.)  Then, the ALJ proceeded to the remaining three steps.

To the extent the Plaintiff appears to suggest that the side effects from his use of Vicodin were a separate impairment, the Court finds no authority to treat these side effects as such. While "an ALJ must consider a claimant's subjective symptoms" when "evaluating the severity of an impairment, . . . there must be a medically determinable impairment that could reasonably be expected to produce the symptoms."  Brown v. Barnhart, 04 Civ. 2450 (SAS), 2005 U.S. Dist. LEXIS 7466, at *20–21 (S.D.N.Y. Apr. 22, 2005).  Under 20 C.F.R. § 404.1529(b), "symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect [a person's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."   In this regard, "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques, must show the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged."  Id.

In this case, the Plaintiff's fatigue is a side effect of his use of Vicodin, and is thus not a medically determinable impairment.   Rather, side effects from medication should be considered by the ALJ when making the credibility determination.  See Meadors v. Astrue, 370 Fed. App'x 179, 183 n.1 (2d Cir. 2010).  (holding that when a ALJ determines a claimant's credibility, he must consider seven factors, including  "the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain")  (citing 20 C.F.R. § 404.1529(c)(3)(i)–(vii)).  As such,

the Court will consider the side effects of the Plaintiff's medication when assessing the ALJ's credibility determination below.

The Plaintiff also claims that the ALJ erred in not properly crediting the Plaintiff's asthma, obesity, and gout and arthritis condition in his foot. However, the Plaintiff failed to raise these issues during his hearing nor did he provide the ALJ with any evidence concerning how these conditions would prevent him from performing sedentary work. "It is well established that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." Swigonski v. Astrue, 07-CV-385, 2009 U.S. Dist. LEXIS 102780, at *12 (W.D.N.Y. Nov. 4, 2009) (citing Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004)). See also Bowen, 482 U.S. at 146 n. 5 ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."); 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."). Moreover, the Court notes that Dr. Goldman reviewed the Plaintiff's entire medical record, and was thus aware of these other conditions when he found that the Plaintiff could work with limited restrictions. In any event, as this Court has already established above, even considering the Plaintiff's gout, obesity, asthma and arthritis, there was substantial evidence in the record supporting the ALJ's finding that the Plaintiff had the residual functional capacity to perform sedentary work.

## F. The ALJ's Assessment of the Plaintiff's Credibility

As part of his final determination, the ALJ found that while "the [Plaintiff's] medically determinable impairment could reasonably be expected to cause the alleged symptoms[,] . . . the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functions

capacity assessment. " (Tr. at 30.) The ALJ explained that "the [Plaintiff's] admitted activities of daily living patently contradict his allegations of disability" in that "the [Plaintiff] conceded that he [wa]s able to shower and dress himself as well as cook, clean, do laundry, and shop, independently, on a sustained basis." (Tr. at 31.) The Plaintiff also "asserted that his pain level [was] 9 out of 10 without medication," but "admitted that he did not take any pain medication so that he could drive to work and that he limited himself to only one dosage of pain medication during his workday prior to retirement." (Tr. at 31.) "In addition, the [Plaintiff's] clinical records do not document any complaints regarding the medication side effects alleged by the [Plaintiff]." (Tr. at 31.)

"[A] claimant's subjective report of her symptoms is not controlling but must be supported by medical evidence." Vilardi v. Astrue, 447 Fed. App'x 271, 272 (2d Cir. 2012) (quoting 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529). If the pain is not substantiated by objective medical evidence, the ALJ engages in a credibility inquiry, which

> implicates seven factors to be considered, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. § 404.1529(c)(3)(i)–(vii).

Meadors, 370 Fed. App'x at 183 n. 1.

Here, even though the claimant testified regarding the extent of his impairments, he also testified to being able to perform a wide-range of daily activities. Moreover, Dr. Skeene similarly reported that the Plaintiff was "able to shower and dress independently," as well as "cook[], clean[], do[] laundry, and shop[]." (Tr. at 290.) As such, it was reasonable for the ALJ

to discredit the Plaintiff's subjective claim of total disability from all types of work.  See Genier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010) (finding that when an ALJ assesses a Social Security claimant's credibility, "the ALJ was required to consider all of the evidence of record, including [the claimant's] testimony and other statements with respect to his daily activities") (citing 20 C.F.R. §§ 404.1529, 404.1545(a)(3)).  Furthermore, although the Plaintiff asserts that he had difficulty with performing some of these activities, "disability requires more than mere inability to work without pain.  To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." Prince v. Astrue, 12-727-cv, 2013 U.S. App. LEXIS 211, at *3 (2d Cir. Jan. 4, 2013) (quoting Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983)).  In addition, while the Plaintiff suggests that the ALJ mischaracterized his testimony by stating that his daily activities included cooking, cleaning and doing laundry, the Plaintiff fails to acknowledge that the ALJ's finding was supported by Dr. Skeene's report, which included these as among the Plaintiff's daily activities.

Accordingly, the Court finds that the ALJ did not commit legal error and that there was substantial evidence in the record supporting his conclusion that the Plaintiff was still capable of performing sedentary work as defined in 20 C.F.R. § 404.1567, and was, therefore, not disabled within the meaning of the Act.

### III.    CONCLUSION

The Court has reviewed the findings by the Commissioner and ALJ Weiss.  For the reasons set forth above, it is hereby ordered that the Commissioner's motion for judgment on the pleadings is granted and the Plaintiff's complaint is dismissed.  The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
      February 14, 2013

                                     */s/ Arthur D. Spatt*
                                     ARTHUR D. SPATT
                          United States District Judge